CITRONELLE–MOBILE GATHERING,
INC., et al., Plaintiffs,

v.

John F. O'LEARY, etc., et al.,
Defendants.

Civ. A. No. 77–101–P.

United States District Court,
S. D. Alabama, S. D.

Sept. 15, 1980.

Lester M. Bridgeman, Washington, D. C., G. Sage Lyons and Cooper C. Thurber, Mobile, Ala., for plaintiffs.

William A. Kimbrough, Jr., U. S. Atty., Mobile, Ala., Brian G. Kennedy, Dept. of Justice, Washington, D. C., Diana D. Clark, Dept. of Energy, Washington, D. C., for defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT ON COUNTERCLAIM

PITTMAN, Chief Judge.

This action was filed by Citronelle–Mobile Gathering, Inc. and others, requesting declaratory and injunctive relief against officials of the Federal Energy Administration, now the Department of Energy, and the Secretary of the Department of Commerce.

The government filed a counterclaim seeking to compel Bart B. Chamberlain, Jr. (Chamberlain), Citronelle–Mobile Gathering, Inc. (Gathering), and Citmoco Services, Inc. (Services) (hereinafter sometimes collectively referred to as "defendants"), to make restitution of alleged overcharges received relating to four transfers of crude petroleum to Grand Bahamas Petroleum Company, Ltd. (PETCO), a wholly owned subsidiary of the New England Petroleum Corporation (NEPCO), between December 20, 1973 and May 26, 1974. The first three shipments were sold at a price of $14.00 per barrel and the final shipment at $13.00 per barrel, prices admittedly higher than the price the defendants could lawfully have charged had the sales been made in the United States to United States purchasers.

The government seeks to recover the difference between the payments the defendants actually received and the maximum lawful selling prices allowed by the provisions of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 note (ESA); the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 751 et seq. (EPAA); and the regulations promulgated thereunder which establish the ceiling price for the first sale of domestic crude oil, and the maximum lawful selling price for the resale of domestic crude oil, 6 C.F.R. Part 150 and 10 C.F.R. Part 212. The government also seeks a declaratory judgment that the defendants violated the laws in question, and to recover civil penalties and costs from the defendants.

All parties have filed motions for summary judgment on the counterclaims. They informed the court there were no disputed facts. None were filed as required by Local Rule 8:

> When a motion for summary judgment is filed . . . if it is contended that there are material factual disputes, [the party] shall point out the disputed facts appropriately referenced . . . . Failure to do so will be considered an admission that no material factual dispute exists.

## FINDINGS OF FACT

The defendants Gathering and Services are corporations duly organized and existing under the laws of the State of Delaware, having their principal place of business in Mobile, Alabama. The companies are commonly controlled and were, at all times pertinent hereto, engaged in the business of purchasing crude oil produced principally in the Citronelle field in Mobile County, Alabama, and reselling that crude oil at Mobile, Alabama. Defendant Chamberlain is an officer, director and the principal stockholder, owning a majority of the stock, of the companies. He is a citizen and resident of the State of Alabama.

James R. Schlesinger, Secretary of the Department of Energy, is successor to John F. O'Leary, former Administrator of the Federal Energy Administration (FEA); Donald E. Allen was Regional Administrator, Region IV of FEA, at the time of commencement of this action. Juanita M. Kreps is the Secretary of Commerce of the United States.

Pursuant to the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751 et seq., and Executive Order 11748, the Federal Energy Office (later the FEA and now the Department of Energy) issued regula-

tions governing the allocation and pricing of crude oil and refined petroleum products, published at 10 C.F.R. Parts 205, 210, 211, 212 (effective January 14, 1974). At all times relevant hereto, prior to the effectiveness of the FEA regulations, pricing and crude oil was subject to regulations of the Cost of Living Council (CLC), 6 C.F.R. Part 150 issued pursuant to the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note.

Exports, and domestic sales for export, of crude petroleum subject to export license regulations of the Department of Commerce (DOC) were and are expressly excluded from FEA's petroleum allocation regulations, 10 C.F.R. § 211.1. Prices charged for export sales, including sales to a domestic purchaser which certifies the product is for export, are exempt from FEA's petroleum pricing regulations, 10 C.F.R. § 212.53.

From time to time during the period December 1973 to April 1974, the defendant companies contracted with Grand Bahamas Petroleum Company, Ltd. (PETCO) to sell crude oil to PETCO, at a price higher than the domestic price permissible under otherwise applicable FEA regulations, for refining in the Bahamas at a refinery partly owned by PETCO. During this period applications for a license were made to and approved by DOC as follows:

On or about December 20, 1973, Gathering filed an application for a license to export 250,000 barrels of crude oil to PETCO in the Bahamas. On or about December 21, 1973, this application was approved and a validated export license (No. C–31226–701–1) issued on December 26, 1973, as requested in the application.

On or about December 20, 1973, Gathering filed a second application for a license to export 250,000 barrels of crude oil to PETCO in the Bahamas. On or about January 2, 1974, the second application was approved and validated export license (No. B 400102–266–1) issued as requested in the application.

On or about January 17, 1974, Gathering filed an application to amend the first application to include an additional quantity of crude oil, which amendment was approved on January 18, 1974.

On or about February 22, 1974, Gathering filed an application for a third license to export 250,000 barrels of crude oil to the Bahamas. On or about February 25, 1974, the third application was approved and a validated export license (No. C–40226–703–1) issued to Gathering as requested in that application.

On or about April 2, 1974, Services filed an application for a license to export 250,000 barrels of crude oil to the Bahamas. On or about April 12, 1974, this fourth application for export license was approved and a validated export license (No. 40416–708–1) issued on April 15, 1974, for the shipment of 184,000 barrels of crude oil to the Bahamas.

Each application for export license disclosed that a volume of refined petroleum equivalent to the quantity of crude oil to be exported would be re–exported from the Bahamas to the United States by PETCO. The applications for the export licenses and the amendment issued to Gathering and Services truthfully set forth all facts upon which the Office of Export Administration of DOC issued the export licenses and the amendment. No export license or amendment thereto was issued to or approved for the defendant companies or either of them, or for Bart B. Chamberlain, Jr., at any time in 1973 or 1974 other than those above identified. None of the export licenses or amendments thereto identified above was at any time revoked or cancelled.

Pursuant to the four export licenses issued to the defendant companies above identified, and to Commerce Department Export regulations allowing for 10% tolerance in shipments pursuant to export licenses, crude oil was shipped from Mobile, Alabama, to Freeport, Bahamas, during the period January 1974 to May 1974 as follows:

a. On or about January 6, 1974, Gathering shipped 279,000 barrels of crude oil from Mobile to Freeport.

b. On or about January 22, 1974, Gathering shipped 255,000 barrels of crude oil from Mobile to Freeport.

c. On or about February 25, 1974, Gathering shipped 231,000 barrels of crude oil from Mobile to Freeport.

d. On or about May 26, 1974, Services shipped 200,000 barrels of crude oil from Mobile to Freeport.

The defendants were paid by PETCO for the first three shipments at the agreed-upon price of $14.00 per barrel, and for the last shipment at the agreed-upon price of $13.00 per barrel.

## I. Parties to the Transactions

Defendant Citronelle-Mobile Gathering, Inc. operates an oil pipeline in the Citronelle oil field in southwest Alabama. It also purchases crude oil for resale. Defendant Citmoco Services, Inc. operates a terminal facility in the Citronelle field; it has purchased crude oil for resale as well. Defendant Bart B. Chamberlain, Jr. owns approximately 90% of Gathering, and 87.5% of Services. He owns the largest working interest in the Citronelle field among some 900 owners. Chamberlain Testimony at 18-20, 23, 50-51.

New England Petroleum Company (NEPCO) is a New York corporation with its headquarters in New York. NEPCO's primary business is the sale of No. 6 heating oil in the United States. NEPCO depended primarily, but not exclusively, for its supply of No. 6 heating oil on Grand Bahamas Petroleum Company (PETCO), its wholly-owned Bahamian-incorporated subsidiary. PETCO arranges for the refining of its crude oil by Bahamas Oil Refining Company (BORCO), a Bahamian partnership. BORCO is owned by two entities. The first is "PETCO Partnership," which is a partnership of two NEPCO subsidiaries, Grand Bahamas Petroleum Company and PETCO, Ltd., an "offshore" corporation. The subsidiaries through this partnership own 50% and 15%, respectively, of BORCO. The remaining 35% is owned by Chevron Oil of the Bahamas, Ltd., a subsidiary or affiliate of Standard Oil of California. Costikyan Dep. at 25, 74; Covert Dep. at 9; Jackson Dep. at 29; Lauria Dep. (May 29, 1979) at 63-64.

PETCO purchased crude oil for its own account, had BORCO refine it, and sold the product to NEPCO and other companies. PETCO extended 90-day credit terms to NEPCO. The two companies performed a reconciliation each month, disposing of the oldest invoices. NEPCO generally had a liability on the account, and would periodically transfer funds, usually by telegraph, to reduce the balance. Covert Dep. at 32; Lauria Dep. (May 29, 1979) at 16, 31-32, 73; Lauria Dep. (Aug. 1, 1979) at 53-56, Exhs. 1A-3B.

PETCO maintained funds in the normal course of business to pay its liability for purchases of crude oil. NEPCO would occasionally pay PETCO's debts. Such a transaction would be credited to NEPCO's current account. This was a standard practice between the companies. Lauria Dep. (May 29, 1979) at 30; Lauria Dep. (Aug. 1, 1979) at 54-55, 63.

The date of PETCO's formation is not in evidence. It was probably formed before 1970, the year in which BORCO was formed. Tax considerations were at least part of NEPCO's motivation in creating the PETCO subsidiary. Transcript of telephone conversation between Ted Jackson of NEPCO and Chamberlain of Dec. 27, 1973, Jackson Dep. Gov't. Exh. 4.

PETCO and BORCO initially had accounts with Barclays Bank International in New York and Freeport, Bahamas. Because the Citronelle transactions were accomplished by means of letters of credit with First National City Bank of New York, PETCO later opened an account with that bank. Each company kept separate books. Lauria Dep. (May 29, 1979) at 13-14.

Beyond NEPCO's payment of some PETCO debts, the companies shared some functions and personnel. NEPCO's concern was to maximize profits for the entire group. The internal auditing department at NEPCO audited the books for all companies within the group. NEPCO's treasury department would often assist PETCO in arranging financing and letters of credit with New York banks. Berdy Dep. at 16; Jackson Dep. at 45-46, 48-49; Lauria Dep. (Aug. 1, 1979) at 70.

Edward M. Carey, Sr. was the sole stockholder and president of Carey Energy Corporation, of which NEPCO, and therefore PETCO and BORCO, were subsidiaries. Carey was president of NEPCO, a director of PETCO, and a member of the BORCO partnership committee. Each company had its own employees for basic functions such as controller, treasurer, and supply logistics, although as noted above, NEPCO personnel were sometimes enlisted to aid in PETCO transactions. Berdy Dep. at 7–8; Costikyan Dep. at 15; Covert Dep. at 11–12, 28; Lauria Dep. (May 29, 1979) at 11–12.

Apart from sharing certain functions and personnel, it is clear that PETCO was an independent entity, and not an alter ego for NEPCO.

## II.  The Transactions

The four shipments of crude oil were made pursuant to an oral agreement negotiated by Edward M. Carey, Sr. on behalf of PETCO and by defendant Bart B. Chamberlain, Jr. on behalf of Gathering and Services. The agreement was implemented by three letters. The first, written on or about December 20, 1973 from Gathering to PETCO, provided for two shipments of 250,000 barrels each, on or about December 29, 1973 and January 25, 1974. The second letter, written on or about February 14, 1974 from Gathering to PETCO, provided for one 250,000–barrel shipment during February 22 to 26, 1974. The third letter, written on or about March 27, 1974 from Services to PETCO, provided for one 250,-000–barrel shipment during April 6 to 10, 1974. The following shipments were made:

| Date | Barrels | Invoice Price/Bbl | Price/Bbl in 60 days |
|------|---------|-------------------|----------------------|
| 1/7/74 | 279,213.47 | 4.35 | 9.65 (3/6/74) |
| 1/23/74 | 254,640.86 | 5.35 | 8.65 (3/22/74) |
| 2/27/74 | 231,442.72 | 5.35 | 8.65 (4/26/74) |
| 5/27/74 | 199,812.86 | 5.35 | 7.65 (7/25/74) |

Doc. No. 109; Berdy Dep. at 5; Jackson Dep. at 63–75, Gov't. Exhs. 12–15.

NEPCO paid all or part of the first invoice, and part of the second and third invoices. PETCO paid part of the second and third invoices, and all of the fourth. NEPCO's payments were credited to its account with PETCO. Berdy Dep. at 31, 39, Gov't. Exh. 12; Lauria Dep. (May 29, 1979) at 35–36, 39 Exh. 1; Lauria Dep. (Aug. 1, 1974) at 63–64, 66.

All second portions of the payments were made by means of letter of credit established in favor of Gathering and Services, and on behalf of PETCO, with First National City Bank of New York. One application for such a letter was signed by T. C. Covert as General Manager of PETCO. Ted Jackson and Denton DeBaun, NEPCO employees, negotiated the letters of credit on behalf of PETCO. Because of the overloading on the first shipment which required an amendment to the export certificate, the letter of credit had to be increased. This was done at the request of Ted Jackson in a letter of January 7, 1974 to First National City Bank, written on NEPCO stationery. Berdy Dep. at 20, 40; Jackson Dep. at 20–23, 26, 38, Gov't. Exh. 2.

At the request of First National City Bank, NEPCO guaranteed PETCO's indebtedness on the letters of credit. This was a "continuing guarantee" signed by DeBaun. NEPCO also assisted PETCO in establishing an account at that bank so that the letter of credit could be paid. Such guarantees and assistance were routine. Berdy Dep. at 24–25, 36; DeBaun Dep. at 5; Jackson Dep. at 29, 44, Gov't. Exhs. 3, 6, 7, 9.

The only question regarding these transactions which is substantially controverted is whether Carey negotiated the agreements on behalf of PETCO or on behalf of NEPCO. The government asserts that Carey negotiated on behalf of Carey Energy Corporation, NEPCO, PETCO and BORCO. Had the contracts been between the defendants and Carey Energy or NEPCO, of course, the transactions would clearly have been domestic in all material elements. The government's argument, however, proves too much. Carey was a director of PETCO, and might as well have acted for PETCO as for any of his other companies. That the companies were operated for their common benefit does not permit this court to ignore their existence.

There is no evidence that PETCO was not maintained as a separate entity from other members of the group, or that there was no valid business purpose for its existence. Notwithstanding the significant involvement of NEPCO in the transactions, this court finds that Carey acted on behalf of PETCO in purchasing the crude oil.

Carey aided and abetted the defendants in securing the export licenses. It must be viewed that Carey acted on behalf of his interested companies to the mutual benefit of them and the defendants.

The defendants prepared affidavits in support of their applications for export licenses, which stated that the volume of refined products available in the United States would not be reduced. These were signed by T. C. Covert for PETCO, Edward M. Carey, Sr. for NEPCO, and David M. Tappen as Vice President of both Gathering and Services. Each affidavit stated in substance

> that such crude oil will be processed in the [BORCO] refinery into various petroleum products, all of which will be exported from the Bahamas to the United States of America.

Counterclaimant's Exh. 2 (Covert affid.); see Counterclaimant's Exhs. 2–12.

The export licenses for the first three shipments were issued by the Department of Commerce. The fourth license, however, was issued only after negotiation with Commerce officials. Their reluctance to issue the fourth license was apparently based on two grounds; first, that the Alaskan Pipeline Act prohibited export of any oil crossing federal rights of way, and second, that domestic refineries were operating at 76% of capacity. Meyer Dep. Exh. 1. Chamberlain, on behalf of Gathering and Services, substituted 30,000 barrels purchased in the Citronelle field from Miller Oil Company for 96,000 barrels purchased from Permian Company which had crossed a federal right of way. Chamberlain argued that the companies had relied upon the gathering of past applications in the planning for the fourth shipment. He further argued that if the license was not granted, flow from the Citronelle field would have to be stopped because of lack of storage capacity. This would have resulted in a permanent loss of part of the oil in the field, because the system is operated by water recovery.

The license was issued for 184,000 barrels plus or minus ten percent, or 250,000 barrels adjusted as described above. Meyer testified that the Department of Commerce granted the fourth application only because it concluded that it had no choice under its regulations:

> We did not specifically spell out in the regulations how we would handle applications for export of crude oil that did not cross federal rights of way, and furthermore, we had previously issued licenses for three more or less identical transactions, and the phase of the regulations, and the phase of our practice, we were in no good legal position to say no to the fourth application.

Meyer Dep. at 22.

In a memorandum concerning the fourth application dated April 24, 1974, Meyer noted that

> Price was not considered in the processing of the three applications noted above.
>
> New information provided on March 8, 1974, by the Federal Energy Office (FEO) gave cause to hold the April 2 application submitted by CITMOCO Services, Inc. The FEO has reason to believe, and IRS is presently investigating, that the applicant may be violating FEO price and supply regulations.

Meyer Dep. Exh. 1 at 2–3.

### III. Delegation of Authority

A letter of December 10, 1973 from Secretary of Commerce Frederick B. Dent to William E. Simon, head of the Federal Energy Office, states:

> This will confirm your decision of Friday afternoon directing that the Department of Commerce initiate a system of export controls on petroleum products to fulfill the President's responsibility under "The Emergency Petroleum Allocation Act of 1973."

To simplify administrative procedures and avoid the necessity of publishing a new set of rules for comment, we propose moving under the authority granted us under the Export Control Act, but will fulfill in toto the export controls required by the Emergency Petroleum Allocation Act of 1973.

■ This letter establishes that the Department of Commerce assumed responsibility for export controls under the EPAA. *See* Exec. Order No. 11748, § 8, 38 Fed.Reg. 33575 (1973). Commerce in fact promulgated regulations, in Export Administration Bulletin No. 106 (Dec. 13, 1973) (then codified at 15 C.F.R. § 377). FEO allocation regulations expressly deferred to these export controls. 15 C.F.R. § 211.1(b)(1) (1973). *See generally* Plaintiffs' [defendants to counterclaim] Exh. No. 10 of May 30, 1977, Appendix B (Subcomm. on Oversight and Investigations, House Comm. on Interstate and Foreign Commerce, 94th Cong. 2d Sess., Alleged Political Pressure to Obtain Export Licenses for Crude Oil (Mar. 1976)).

Price regulations, however, were not affected by this delegation, and remained within the jurisdiction of the FEA. The FEA and the Cost of Living Council promulgated rules for the "export sales" provisions of EPAA and ESA regulations. *See* CLC Ruling 1973–3, 38 Fed.Reg. 17523 (1973); CLC Ruling 1974–3, 39 Fed.Reg. 10152 (1974); Special Rule No. 7, 41 Fed. Reg. 18646 (1976); FEA Interp. 1977–16, 42 Fed.Reg. 31151 (1977).

The use of the words "export controls" in Secretary of Commerce Dent's letter may be traced to the Export Administration Act of 1969, Pub.L.No.91–184, § 3(2) & (3), 83 Stat. 841, and the Export Administration Act of 1972, Pub.L.No.92–412, Tit. I, § 103(6), 86 Stat. 644. Section 3(2) provides, in part:

It is the policy of the United States to use *export controls* (A) to the extent necessary to protect the domestic economy from the excessive drain of scarce materials . . . .

Pub.L.No.91–184, § 3(2), 83 Stat. 841 (emphasis added). Neither the 1969 act nor the 1972 amendments in force when Secretary Dent wrote his letter provided for regulation of price by the Department of Commerce. "Export controls" referred only to regulations "prohibit[ing] or curtail[ing] . . . exportation," *id.* § 4(b), not to price regulation. Similarly, the Export Control Act of 1949, ch. 11, §§ 2, 3, 63 Stat. 7, did not provide for price regulation. Secretary Dent proposed "moving under the authority granted [to the Department of Commerce] under the Export Control Act." This court only have referred to allocation regulations, and not price regulations.

The defendants note two amendments to export control regulations which, they argue, demonstrate that the Department of Commerce assumed jurisdiction of price as well as allocation controls. This argument is to no avail. The April 18, 1974 amendment adding 15 C.F.R. § 377.6(d)(1)(ii)(c) dealt only with an additional requirement for an exemption from the prohibition on oil exports. The October 1, 1975 amendment, after these transactions, to that subsection, 40 Fed.Reg. 45159 (1975), was promulgated on the premise that price controls under the EPAA had expired. *See* 40 Fed. Reg. 40507 (1975). *See generally Citronelle–Mobile Gathering, Inc. v. Gulf Oil Corp.*, 420 F.Supp. 162 (S.D.Ala.1976), *remanded*, 578 F.2d 1149 (5th Cir. 1978), *appeal dism'd*, 591 F.2d 711 (Em.App.1979), *cert. denied*, 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979). The published explanation noted "the expiration . . . of the allocation and price control systems administered by the Federal Energy Administration." 40 Fed.Reg. at 45159.

### IV. Tracing Crude Oil and Product

The defendants by affidavit represented to the Department of Commerce that the products which were refined from Citronelle crude would be exported to the United States. The court finds that they were in fact exported to the United States.[1]

---

1. Whether "the same molecules" returned to the United States, of course, is unlikely. *See*

Chamberlain Testimony at 183, 187. Although the BORCO partners were credited based on

The task of determining the path of the product to the United States is extraordinarily complex, but not impossible. The court does not at this time have sufficient information to determine which of NEPCO's customers were affected by the alleged overcharges. An expert could, however, reach reasonable conclusions about where the product went. *See* Costikyan Dep. at 66–68; Covert Dep. at 27–28, Exhs. 12–18. *But see* Lauria Dep. (June 22, 1979) at 47 ("purely theoretical numbers").

NEPCO's customers were primarily utilities on the East Coast from Florida to Massachusetts. They included: Tampa Electric Company, Jacksonville Electric, Georgia Power Company, Public Services Gas & Electric, Virginia Electric Power, Orange & Rockland, Philadelphia Electric, Consolidated Edison, Long Island Lighting, New Bedford, and New England Gas & Electric. Costikyan Dep. at 16–27; Lauria Dep. (June 22, 1979) at 6–11. Seventy to eighty percent of NEPCO's product went to these utilities. The other twenty to thirty percent was sold to a New York retailer, Burns Brothers, New England and New Jersey retailers, and Canadian companies. Costikyan Dep. at 30–32. At some ports, deliveries were made for one customer, while in New York, for example, deliveries might be made for redelivery to a number of the utilities. *See* Lauria Dep. (June 22, 1979) at 7, 19. The Department of Energy is currently conducting an audit of NEPCO's books in an attempt to determine which customers received product from Citronelle crude. Doc. No. 109.

The type of product requested varied from customer to customer, depending upon sulphur content, pour point, and viscosity. Covert Dep. at 25.[2]

### V. Other Findings

Some records maintained with regard to these transactions by NEPCO, PETCO and BORCO have been destroyed in the ordinary course of those companies' business. Costikyan Dep. at 66–68; Lauria Dep. (May 29, 1979) at 33. It appears, however, that substantial records, or the recollection of company employees, is still available. Costikyan Dep., Exh. 2; Covert Dep. at 27–28, Exhs. 12–18. The court concludes that, at this point at least, the defendants have not been substantially prejudiced by any delay on the government's part in bringing its counterclaim.

### CONCLUSIONS OF LAW

The court has jurisdiction over the subject matter of this counterclaim pursuant to §§ 208, 209 and 211 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, as incorporated in § 5(a) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 754(a), and pursuant to § 502(b) of the Department of Energy Organization Act, 42 U.S.C. § 7192(b).

### I. Limitations

The defendants contend that the government's claim for restitution under § 209 of the Economic Stabilization Act is barred by Alabama Code § 6–2–39(5), which provides for a one–year limitation on

[a]ctions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section . . . .

This contention finds some support in *EEOC v. Griffin Wheel Co.*, 511 F.2d 456 (5th Cir. 1975), *clarified*, 521 F.2d 223 (5th Cir. 1975), where the court stated that a claim for back pay filed by the EEOC on behalf of employees was a "private action" subject to the statute of limitations. How-

---

specific deliveries of crude, and ran their crude separately, similar types of crude were sometimes commingled, each partner taking its share. Costikyan Dep. at 20–21, Exh. 2; Lauria Dep. (May 29, 1979) at 64; Lauria Dep. (June 22, 1979) at 33.

**2.** Sulphur content requirements ranged from Con Ed's 0.30% to Georgia Power's 1.00%.

Citronelle crude, 0.75% sulphur, is intermediate in sulphur content. To meet customer specifications, Citronelle product was blended either with low–sulphur or high–sulphur product. Costikyan Dep. at 34-39, Exh. 5; *see* Covert Dep. Exh. 12.

ever, in *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 366 n. 22, 97 S.Ct. 2447, 2454 n. 22, 53 L.Ed.2d 402, 411 n. 22 (1977), an enforcement action by the EEOC which included a claim for back pay (*see EEOC v. Occidental Life Ins. Co.*, 535 F.2d 533, 537 (9th Cir. 1976), *aff'd*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977)), the Supreme Court held that a state statute of limitations would not be applied where its application would "frustrate or interfere with the implementation of national policies," or would be "inconsistent with the underlying policies of the federal statute." 432 U.S. at 367, 97 S.Ct. at 2455, 53 L.Ed.2d at 412.

The purposes expressed in § 2 of the Emergency Petroleum Allocation Act, 15 U.S.C. § 751, to prevent economic dislocations caused by oil shortages, are clearly national in scope. This court has previously stated that "the urgency and importance of the energy issue to the nation and its economy cannot be doubted." *Citronelle–Mobile Gathering, Inc. v. Gulf Oil Corp.*, 420 F.Supp. 162, 170 (S.D.Ala.1976), *remanded*, 578 F.2d 1149 (5th Cir. 1978), *appeal dism'd*, 591 F.2d 711 (Em.App.1979), *cert. denied*, 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109 (1979).

■ Enforcement actions under the EPAA and ESA, like those under the Equal Employment Opportunity Act, are "actions brought by the federal government to vindicate combinations of private and public interests." *Marshall v. Intermountain Elec. Co.*, 614 F.2d 260 (10th Cir. 1980) (OSHA). The Temporary Emergency Court of Appeals has held that restitution in ESA enforcement actions is " 'appropriate and necessary to enforce compliance.' " *Univ. of Southern California v. Cost of Living Council*, 472 F.2d 1065, 1070 (Em.App.1972). As an element of the government's enforce-

ment power, a claim for restitution under the EPAA is not subject to the Alabama statute.[3]

*Occidental Life* held that a claim by the government for restitution may be subject to the defense of laches. *Occidental Life Ins. Co. v. EEOC*, 432 U.S. at 372–73, 97 S.Ct. at 2457, 53 L.Ed.2d at 415. As the court has found that the defendants have not been prejudiced by any delay, this defense has not been made out.

## II. Jurisdiction

■ Although the government's counterclaim does not include a prayer for injunctive relief, this court nevertheless has subject matter jurisdiction of the claim for restitution. Section 209 of the ESA provides that,

In addition to . . . injunctive relief, the court may also order restitution of moneys received in violation of any . . . order or regulation.

12 U.S.C. § 1904 note.

The defendants contend that this language demonstrates Congress' intent that federal courts have jurisdiction of a claim for restitution only when it is joined with a prayer for injunctive relief. The statute does not demand, nor does any policy of the ESA commend, such a result. *See United States v. Pro Football, Inc.*, 514 F.2d 1396 (Em.App.1975) (restitution only); *cf. Creedon v. Randolph*, 165 F.2d at 919–20 (EPCA).

Section 209 provides for three types of relief: traditional injunctions, mandatory injunctions, and restitution. The drafters employed the words "also" and "[i]n addition to" in order to give grammatical sense to the statute; the words were not intended by Congress to require that each form of

---

**3.** Similarly, the Price Administrator's claim for restitution under § 205(a) of the Emergency Price Control Act of 1942 was characterized as an enforcement remedy. The court stated:

That it operates to confer a benefit on the tenant . . . does not detract at all from the enforcement effect nor alter its nature.

*Creedon v. Randolph*, 165 F.2d 918, 919 (5th Cir. 1948) (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332

(1946)); *cf. Chris–Craft Ind., Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 390-91 (2d Cir. 1973) (SEC enforcement action), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *S. E. C. v. Manor Nursing Ctrs.*, 458 F.2d 1082, 1104 (2d Cir. 1972).

*Ashland Oil Co. v. Union Oil Co.*, 567 F.2d 984, 989 (Em.App.1977), cited by the defendants, is inapposite. That case was a private action for damages under § 210 of the ESA.

relief be available and prayed for before a mandatory injunction or restitution could be granted. The legislative history of the 1971 amendments, further, indicates that Congress intended to clarify the courts' power to grant restitution, and not to limit it:

It was not certain that, in these circumstances, there was an inherent equitable power in the court to set things right and order restitution. ... This provision makes clear that the court has power to grant restitution.

S.Rep.No.507, 92d Cong., 2d Sess. (1971), reprinted in [1971] U.S.Code Cong. & Admin.News pp. 2283, 2291.

■ Section 209 authorizes an action by the government "[w]henever it appears ... that any individual or organization has engaged, is engaged, or is about to engage" in a violation of the ESA. 12 U.S.C. § 1904 note (emphasis added). Ancillary equitable relief such as restitution is clearly available for a past violation of the Act. It may be the only relief available for a past violation where, as here, the allegedly unlawful activity has ceased and no injunction is available. See, e. g., United States v. Oregon State Med. Soc'y, 343 U.S. 326, 334, 72 S.Ct. 690, 696, 96 L.Ed. 978, 985 (1952).

■ Further, the Temporary Emergency Court of Appeals has repeatedly measured the powers conferred by the ESA and EPAA "by the broad purposes of the Congressional mandate." Bonray Oil Co. v. Department of Energy, 472 F.Supp. 899, 904 (W.D.Okl.1978), aff'd, 601 F.2d 1191 (Em. App.1979). Limiting the availability of restitution as proposed by the defendants would strictly limit an enforcement tool which Congress was careful to provide for in actions under the ESA. Cf. SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir. 1972) (SEC enforcement action). This court therefore concludes that the government may maintain an enforcement action for restitution in the absence of other claims for relief.

III. Liability of Defendant Chamberlain

Chamberlain is sued as a "producer" subject to price ceilings contained in 6 C.F.R. Part 150, Subpart L, and 10 C.F.R. Part 212, Subpart D. Any overcharges which he received in sales which violated the EPAA would be subject to restitution.

■ When a corporate officer or director is a central figure in tortious conduct, or when he authorizes, participates and approves of that conduct, he is subject to liability based upon that conduct. L.C.L. Theatres, Inc. v. Columbia Pictures Ind., Inc., 619 F.2d 455 (5th Cir. 1980); accord, Donsco, Inc. v. Casper Corp., 587 F.2d 602, 605–06 (3rd Cir. 1978); Tillman v. Wheaton–Haven Rec. Ass'n, 517 F.2d 1141 (4th Cir. 1975); Davis H. Elliot Co. v. Carribean Utilities Co., 513 F.2d 1176, 1182 (6th Cir. 1975); Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., 467 F.Supp. 841, 851–54 (N.D.Cal.1979); see Restatement (Second) of Agency § 343 (1958). This doctrine does not depend upon the same grounds as piercing the corporate veil, that is, inadequate capitalization, use of the corporate form for fraudulent purposes, or failure to comply with formalities of organization. L. C. L. Theatres, Inc. v. Columbia Pictures Ind., Inc., 619 F.2d at 457; Donsco, Inc. v. Casper Corp., 587 F.2d at 606. Rather, the officer or director is liable as an actor, not an owner. Id.

■ Chamberlain was a central figure in the sales of crude oil by Gathering and Services. He is therefore subject to liability for any violations of the EPAA in those sales. Because restitution is predicated upon a finding of unjust enrichment, however, Chamberlain would be individually liable only to the extent that he received proceeds from those sales. See 1 G. Palmer, Law of Restitution, §§ 2.1, 2.10 (1978).

IV. Violation or Exemption

The four shipments of crude oil were subject to Subchapter B, Chapter III of Title 15 of the Code of Federal Regulations, as effective on the dates of shipment. The export licenses and the amendment issued

to Gathering and Services were issued pursuant to the requirements of Subchapter B, Chapter III of Title 15 of the Code of Federal Regulations. Ten C.F.R. § 211.-1(b)(1), as effective during the period from January 15, 1974 through May 30, 1974, provided:

Exports of crude petroleum and petroleum products subject to Subchapter B of Chapter III of Title 15 of the Code of Federal Regulations are excluded from this part. [Part 211]

Petroleum prices were governed by 6 C.F.R., Part 150 from December 15, 1973 through January 14, 1974, and by 10 C.F.R. Part 212 from January 15, 1974 through May 30, 1974. Title 6, § 150.54(d)(1) provided:

The prices charged for export sales including the sale of products to a domestic purchaser who certifies that the product is for export are exempt.

Title 10, § 212.53(a) provided:

The prices charged for export sales of covered products including sales to a domestic purchaser which certifies the product is for export are exempt.

Whether the defendants violated the price regulations of Title 10, Part 212 depends upon the construction of the words "export" in § 211.1(b)(1) and "export sale" in § 150.-54(d)(1) and § 212.53(a). If the terms are equivalent, then there was no violation because the transactions were exempted by the export licenses. If all "exports" are not "export sales," then any charges over the ceiling price would have been received in violation of the price regulations.[4]

Section 4(b)(1)(F) of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. § 753(b)(1)(F), authorizes regulations which provide for "equitable distribution of . . . refined petroleum products at equitable prices." Section 202 of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note, states Congress' finding

that in order to stabilize the economy, reduce inflation . . . and protect the purchasing power of the dollar, it is necessary to stabilize prices . . . and that in order to . . . assure sufficient supplies of petroleum products to meet the essential needs of various sections of the Nation, it is necessary to provide for the rational and equitable distribution of those products.

The allocation and price regulations had been administered according to different criteria even prior to the transactions at issue. In a July 2, 1973 ruling, the Cost of Living Council stated that the purpose of the "export sale" exemption was

to allow sales of exports which will produce revenue from foreign sources to be made at the highest price. Transactions which will not produce such revenue shall, therefore, not be considered exports for the purpose of exemption from the regulations under the economic stabilization program.

CLC Ruling 1973–3, 38 Fed.Reg. 17523 (1973). A CLC ruling of March 18, 1974 is in accord. CLC Ruling 1974–3, 39 Fed.Reg. 10152 (1974). The allocation regulations in Part 211 expressly deferred to Department of Commerce determinations of what constituted an export. No such provision is found in Part 212, or in Part 150 of Title 6.

■ The defendants place great weight upon the letter from Commerce Secretary Dent to FEO Administrator Simon, confirming the delegation of EPAA authority,

4. During the relevant period, CLC, FEO, and FEA price regulations applicable to producers of crude oil established a two–tier pricing system. Under this system, a producer was required to determined a base production control level (BPCL) for each property based upon production and sale of crude oil from that property in each month of 1972. That portion of production and sale from a particular property equal to or below the BPCL was termed "old" oil and was subject to a ceiling price comprised of the "posted price" on May 15, 1973, plus $0.35 ($1.35 after December 19, 1973) per barrel. Crude oil produced and sold in excess of 1972 production levels was termed "new" oil and could be sold without regard to the ceiling price imposed on "old" oil. In addition, for each month in which "new" oil was produced and sold, an equal amount of "old" oil was released from the constraints of the ceiling price ("released" oil). During all relevant times, the ceiling price of "old" oil produced from the Citronelle field was $4.10, and after December 19, 1973, $5.10 per barrel.

to support their argument that FEO retained no jurisdiction over price controls. In view of the confused state of the administration of the newly–enacted Emergency Petroleum Allocation and Alaskan Pipeline Acts, the question of delegation is difficult. Taken in the broadest sense, however, "control" of products to be exported may be divided among several agencies. *See, e. g.,* Export Administration Act, 50 U.S.C.App. §§ 2403–2404. The CLC's successor agencies inherited that agency's price regulations, along with at least one published ruling on the "export sales" provision. It is reasonable to conclude that the agencies contemplated that a delegation of the "export control" function might not include all controls under the EPAA. The prior history of export control statutes suggests that the term "export controls" did not include price regulations.[5]

The defendants have not suggested that the export licenses by their terms exempted the four transactions from the price controls of Title 6, Part 150 and Title 10, Part 212. They rely instead on the argument that the "export sales" provision is coextensive with the "exports" exemption of Part 212. This position finds no support in the development of the regulations in Parts 211 and 212, which had begun well before these transactions. The inclusion within the term "export sales" of certain domestic transactions where the product is destined for export suggests that the two terms have different meanings.

▮ Finally, these transactions had precisely the effect which Congress sought to avoid in enacting the EPAA. The EPAA and ESA do not call upon this court to determine whether the transactions caused a "net increase in the balance of payments," whether the alleged benefits to the Citronelle field actually accrued, or whether the transactions were a "good thing." Such a determination would be a judgment on the

wisdom of the enactment itself, and is a question for Congress. The court must determine whether the transactions were exempted from pricing regulations by the export license. They were not.·

The Supreme Court has cautioned, in *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968), that courts should "look at the economic reality" of transactions to determine their effect. Thus, the court held that transactions which were "exports" under other regulatory schemes were not "acts done in the course of export trade" under the Webb–Pomerene Act. 393 U.S. at 211, 89 S.Ct. at 368, 21 L.Ed.2d at 353 (White, J., dissenting). The economic effect of the transactions in this case was higher oil prices to American buyers.

CLC, FEO and FEA price rulings follow a consistent policy of examining the substance of a transaction in applying the price regulations to export sales. *See, e. g.,* CLC Ruling 1973–3, 38 Fed.Reg. 17523 (July 2, 1973); CLC Ruling 1974–3, 39 C.F.R. 10152 (Mar. 14, 1974). The Emergency Court of Appeals has considered the regulations of these three agencies as being "carried forward" to the successor agencies. *Mobil Oil Corp. v. FEA,* 566 F.2d 87, 90 (Em.App. 1977); *Marathon Oil Co. v. FEA,* 547 F.2d 1140, 1146 (Em.App.1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 378 (1977).

Even assuming that the agencies' interpretive regulations were not entitled to deference, or were confusing or had made expressions contrary to the findings here, this court's findings are consistent with the intent of Congress which is apparent from the purposes of the EPAA and the ESA.

▮ The court accordingly concludes that the four transactions violated the price

---

5. That Commerce represented that it would fulfill "in toto" the requirements of the EPAA suggests that it did not fully comprehend the scope of that act, not that it intended to adopt price regulations. *See* Plaintiffs' [defendants to counterclaim] Exh. No. 10 of May 30, 1977

(Subcomm. on Oversight and Investigations, House Comm. on Interstate and Foreign Commerce, 94th Cong., 2d Sess., Alleged Political Pressure to Obtain Export Licenses for Crude Oil (Mar. 1976)).

regulations of 6 C.F.R. Part 150, and 10 C.F.R. Part 212, as then in force.[6]

## V. Restitution

In its prayer for relief, the government requests that the court

[e]nter a judgment requiring Gathering, Services and Chamberlain to pay into an escrow account, for subsequent distribution to NEPCO customers, a sum between $6,000,000 and $9,000,000, plus interest.

Docket No. 68, Prayer for Relief, ¶ B. The government further contends that any undistributed amounts should be paid to the United States Treasury:

If the money could not be restored to NEPCO's customers, then it should go to either NEPCO, or if NEPCO were for some reason barred from recovery, to the United States Treasury for the benefit of its citizens generally.

Government's Brief in Support of Its Motion for Summary Judgment, filed Sept. 18, 1979, at 31 n. *.

The defendants object that there is no allegation that NEPCO customers were overcharged, that the government has failed to establish who, or whether any of the customers was injured, and that any such customers are indirect purchasers barred from recovery under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), *rev'g* 536 F.2d 1163 (7th Cir. 1976), *aff'g* 67 F.R.D. 461 (N.D.Ill.1975). The government replies that a claim for restitution by its nature avoids the complexities inherent in actions for damages by indirect purchasers, and that *Illinois Brick* therefore does not apply.

The amended counterclaim does not allege specifically that NEPCO customers were overcharged, nor does it allege the disposition of unclaimed amounts as discussed in the government's briefs. The defendants' discovery and argument indicate, however, that they clearly understood that these contentions had been raised. The court will therefore treat the allegations as properly raised. *Fed.R.Civ.P.* 15(b).

The defendants urge this court to adopt as controlling in this case *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

This court does not think *Illinois Brick* should be applied to bar recovery in this action. Both *Illinois Brick* and *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), were private actions for damages under § 4 of the Clayton Act. Section 210 of ESA is the private action counterpart to § 4 of the Clayton Act. The clear language of § 210(b) refers to any person " 'who is found to have overcharged the *plaintiff*.' " *See Florida Power & Light Co. v. Belcher Oil Co.*, 82 F.R.D. 78, 27 F.R.Serv.2d 380 (S.D.Fla.1979) (emphasis added). That language is not present in § 209 as it does not foresee private actions or damage claims. Section 209 permits substantively and procedurally different remedies apart from damages. There are significant substantive differences between restitution and damages.[7]

The policies underlying those cases are largely inapplicable to enforcement actions by the government, and restitutionary relief by its nature does not have some of the difficulties which arise in actions for damages.

In an enforcement action, there is no danger that the incentive to enforce the law will be reduced by permitting indirect purchasers to recover. *See Illinois Brick Co. v. Illinois*, 431 U.S. at 735, 745–47, 97 S.Ct. at 2069, 2074–75, 52 L.Ed.2d at 718,

---

6. Because of this holding the court will not consider whether the transactions constituted a "means to evade" the provisions of the regulations. *See* 10 C.F.R. § 210.62(c).

7. "*Restitution*, which lies within that equitable jurisdiction, is consistent with and *differs greatly from the damages and penalties ....*" (emphasis added). *Porter v. Warner Holding Co.*, 328 U.S. 395, 402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332, 1339 (1945); *accord* D. Dobbs, *Handbook of the Law of Remedies* § 4.1, at 224 (1973). *See also Bowles v. Skaggs*, 151 F.2d 817, 821 (6th Cir. 1945), and compare *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1307 (2d Cir. 1971).

724–26. Indeed, if the government were not permitted to represent indirect purchasers, enforcement of the ESA and EPAA would suffer. The efficient enforcement of these acts is best served by leaving actions by the government as free as possible of the constraints placed upon private plaintiffs. *Cf., e. g., General Tel. Co. v. EEOC*, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (EEOC need not satisfy Rule 23 requirements).[8]

This action in any event requires an exception to *Illinois Brick*. Courts have found exceptions to the *Illinois Brick* rule where the antitrust laws would go unenforced in the absence of suits by indirect purchasers. Indirect purchasers may sue where the direct purchaser is a division or subsidiary of a violator, *see Royal Printing Co. v. Kimberly–Clark Corp.*, 621 F.2d 323 (9th Cir. 1980), and where the violator and the direct purchaser are co–conspirators, *see Fontana Aviation, Inc. v. Cessna Aircraft Co.*, 617 F.2d 478 (7th Cir. 1980). *See also In re Beef Industry Antitrust Litigation*, 600 F.2d 1148 (5th Cir. 1979) ("cost–plus" contracts and "functional equivalents").

In this case NEPCO and PETCO, or the government on their behalf, would be barred from a restitutionary recovery. NEPCO and PETCO made affidavits in support of the defendants' export licenses and further supported the defendants in receiving the export licenses. This aiding and abetting the defendants in their violation of the pricing regulations for their mutual benefit should and does bar them from seeking or receiving any of the illegal profits. They are barred from recovery by their "unclean hands," as restitution is within the equitable power of the court. *See, e. g., Porter v. Warner Holding Co.*, 328 U.S. 395, 402, 66 S.Ct. 1086, 1091, 90 L.Ed. 1332, 1339 (1945); *Atl. Coast Line R. R. v. Florida*, 295 U.S. 301, 309, 55 S.Ct. 713, 716, 79 L.Ed. 1451, 1457 (1935); *S. E. C. v. Texas Gulf Sulphur Co.*, 446 F.2d 1301,

1307–08 (2d Cir. 1971), *cert. denied*, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). If this court did not permit the government to sue on behalf of the indirect purchasers, the EPAA would go unenforced. Accordingly, the court holds that the action on behalf of indirect purchasers is not barred by *Illinois Brick*.

*Illinois Brick* raised a second policy to bar actions by indirect purchasers. The court was concerned with the evidentiary burden placed upon courts by attempts to apportion a recovery among different levels in a chain of distribution. *Illinois Brick Co. v. Illinois*, 431 U.S. at 737–45, 97 S.Ct. at 2070–74, 52 L.Ed.2d at 719–24; *see Hanover Shoe Co. v. United Shoe Mach. Corp.*, 392 U.S. at 491–93, 88 S.Ct. at 2230–31, 20 L.Ed.2d at 1241. An apportionment of injury must be considered in this case to ensure that this court's equitable remedy is fair. NEPCO's customers were mostly utilities, which probably passed on all or part of their portions of the overcharges to their residential, industrial and commercial customers. Indeed, common knowledge of how electricity is distributed and used makes this probable. The claims of these customers to a share of the recovery could not be ignored.

The principal thrust of restitution has been to force the wrongdoer to "disgorge benefits that it would be unjust for him to keep." D. Dobbs, *Remedies* § 4.1 at 224 (1973); G. Palmer, *Law of Restitution* § 2.6, at 82 (1978); *see Bloomgarden v. Coyer*, 479 F.2d 201, 211 (D.C.Cir.1973). Consistent with the equitable nature of the remedy, courts have been flexible in ensuring that the defendant disgorge his illegal gain, and have not always required payment to individual injured parties. Thus, in *Oakland Raiders v. Office of Emergency Preparedness*, 380 F.Supp. 187 (N.D.Cal. 1974), the court ordered restitution by a

8. Congress clearly intended in ESA enforcement actions not to circumscribe DOE enforcement actions. *See* part II. *supra.* Although individual damage actions under § 210 are limited to direct purchasers, *see Florida Power &* *Light Co. v. Belcher*, 82 F.R.D. 78, 79–80, 27 F.R.Serv.2d 380 (S.D.Fla.1979); *Arnson v. G. M. C.*, 377 F.Supp. 209 (N.D.Ohio 1974), no such express limitations appear in § 209, which authorizes enforcement actions.

prospective reduction of ticket prices to the extent that ticket purchasers were not identifiable. In *United States v. Pro Football*, 514 F.2d 1396, 1402 (Em.App.1975), the court ordered restitution only to those who presented ticket stubs, because of the defendant's good faith. A line of cases from the District of Columbia Circuit provides that, where the return of overcharges to persons who paid is not feasible, the transit company would be required to establish a fund to benefit transit users. *Bebchick v. Pub. Util. Comm'n*, 318 F.2d 187, 203 (D.C. Cir.1963), *cert. denied*, 373 U.S. 913, 83 S.Ct. 1304, 10 L.Ed.2d 414 (1963); *see Democratic Cent. Comm'n v. Wash. Metro. Area Transit Comm'n*, 485 F.2d 786, 826–28 (D.C.Cir. 1973); *Williams v. WMATC*, 134 U.S.App. D.C. 342, 415 F.2d 922, 956–57 (D.C.Cir. 1968), *cert. denied sub nom. D. C. Transit System v. Williams*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969).

Because of the difficulty of apportioning a recovery, should the tort–feasor defendants be permitted to benefit from their profiteering? Should the complexity of the oil industry, or of the industrial and commercial institutions that transact the vast majority of business activity in the United States in similar situations, profit from the complexity of determining the injury to each of thousands or millions of the public consumers?

This court thinks not. Equity has been the conscience of the courts. Quite frankly, this court cannot envision a formula which could make a meaningful distribution to the millions of consumers from Florida to Massachusetts who purchased power or goods or services made or supplied from NEPCO's customers. NEPCO made sales to twelve or more utilities and retailers along the Atlantic seaboard from Florida to Massa-

chusetts. Restitution, an equitable remedy available in this case, is sufficiently flexible to prevent such a result.[9]

It is clear these profits have no character as punishment, but consist of only the overcharged revenues that the defendants were never legally entitled to receive. These defendants have violated the statute and have been unjustly enriched at the expense of all the direct and indirect customers of NEPCO and PETCO. They should not be permitted to keep these gains. *Restatement of Restitution* § 3 (1937). It would be unconscionable to find the defendants in violation of the statute and yet hold that since the task of determining to whom the refunds should go is so formidable that the defendants be permitted to keep their ill–gotten gains. Congress intended such profits to be disgorged by authorizing "restitution." To limit restitution to refunds to those to whom "damage" can be proved would destroy the purpose of the price control regulations and the authorized action by the government under § 209 to seek restitution.

■ This court concludes that in order to deprive the defendants of their illegal gain, restitution should be made to the United States Treasury. Because of the difficulties involved, no attempt will be made to apportion the recovery among the various levels of distribution injured by the defendants' violations. Realistically this holding very simply means that, since the people are sovereign, and where large numbers, here millions, have been injured, the peoples' institution, the United States government, will recover the disgorged wrongful profits.[10]

The government has demonstrated injury to a class of persons. As the District of Columbia Circuit has noted,

9. *See In re Hotel Tel. Charges*, 500 F.2d 86 (9th Cir. 1974), an antitrust case, class treatment was not permissible. A meaningful recovery was precluded since each claim was too small to warrant private action.

10. *See Hodgson v. Wheaton Glass Co.*, 446 F.2d 527 (3d Cir. 1971); *Hansen v. United States*, 340 F.2d 142 (8th Cir. 1965), restitution cases which point the way where recovery has been placed on deposit with the United States Treasury, not subject to the wrongdoer's claims.

The law of class recovery is in flux. The courts are ready to apply bases of recovery with reasonable liberality in order to serve the objectives of the law.

*Bangor & Aroostock R. R. v. Bhd. of Locomotive Firemen & Enginemen*, 442 F.2d 812, 821 (D.C.Cir.1971). To deny recovery in this case would result in an irremediable violation. The doctrine of restitution, however, is sufficiently flexible to avoid this result.

Such a disposition of the recovery does not constitute an "unauthorized penalty." In *Huntington v. Attrill*, 146 U.S. 657, 668–69, 13 S.Ct. 224, 228, 36 L.Ed. 1123, 1128 (1892), the Court noted:

> The test whether a law is penal, in the strict and primary sense, is whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual, according to the familiar classification of Blackstone: "Wrongs are divisible into two sorts or species: *private wrongs* and *public wrongs*. The former are an infringement or privation of the private or civil rights belonging to individuals, considered as individuals; and are thereupon frequently termed *civil injuries;* the latter are a breach and violation of public rights and duties, which affect the whole community, considered as a community; and are distinguished by the harsher appellation of *crimes* and *misdemeanors.*"

The essence of a penalty is punishment for an offense committed against the state. *Id.* at 666–69, 13 S.Ct. at 226–28, 36 L.Ed. at 1127–28. Three factors have been distilled from *Huntington* and later cases to distinguish penal and remedial forms of relief:

> "(1) whether the purpose of the statute was to redress individual wrongs or more general wrongs to the public; (2) whether the recovery under the statute runs to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered."

*In re Wood*, No. 79–1504, slip op. at 8758 (5th Cir. Aug. 22, 1980) (quoting *Murphy v. Household Finance Corp.*, 560 F.2d 206, 209

(6th Cir. 1977)).

As to the first factor this court finds that like most modern consumer remedies § 209 has a dual purpose. On the one hand it is aimed at remedying harm to the individual who could not practically protect himself from violations by allowing the government to enforce the law for the individual's benefit. On the other hand, § 209 seeks to deter prohibited business practices for the good of the general public. Even so, its purpose is not primarily punishment for an infraction of a public law. *See Porter v. Household Finance Corp.*, 385 F.Supp. 336, 342–43 (S.D.Ohio 1974). The first factor therefore indicates that restitution as ordered herein is not penal.

The third factor likewise indicates that the restitution ordered herein is not penal. The amount of restitution is equal to the amount of the illegally obtained profits, and is not at all disproportionate to the harm suffered.

The second factor, taken in the abstract, weighs in favor of characterizing this relief as penal. That the relief flows to the government does not of itself, however, compel the conclusion that it is penal in nature. The Fifth Circuit has noted the necessity to re–evaluate *Huntington* in light of modern business practices and the complexity of the economy. In *In re Wood*, the court stated:

> Candidly acknowledging that TILA [Truth in Lending Act] liability under section 130 "does not fall neatly within the common law categories of either a penalty or a remedial action for injury to property or monetary interest," *id.* at 342, the court concluded that the primary purpose of section 130, *a type of social welfare legislation unknown at the time of Huntington, is remedial . . . .*" (Emphasis added).

*In re Wood*, No. 79–1504, slip op. at 8758 (citing *Porter v. Household Finance Corp.*, 385 F.Supp. 336 (S.D.Ohio 1974)). The relief flows to the government in this case

because it cannot flow to the wronged individuals and because permitting the retention of the illegal overcharges would utterly frustrate the purposes of the EPAA. It is clearly "authorized" under § 209 of the ESA; an analysis of the factors of *In re Wood* demonstrates that it is not a penalty.

## VI. Penalty

■ The assessment of a penalty in this action requires a finding that the defendants "willfully" violated the FEA pricing regulations. Economic Stabilization Act, § 208, 12 U.S.C. § 1904 note. The court has found that the defendants sought the advice of counsel before proceeding with their transactions. The defendants made a good faith effort to comply with the regulations, and clearly and fully explained their transaction to the Department of Commerce.

It is clear that any violation proceeded from the inexperience of the agencies in administering the new regulations, and the unusual time constraints under which they were placed. The regulations contained no examples which might have alerted the defendants that they came within the terms of one regulation, but not of the other.

Accordingly, no penalties will be assessed.

## VII. Amount of Recovery

The court is unable to determine from the evidence the amount of restitution to be made. The parties will accordingly be permitted the opportunity to enter a stipulation, failing which, to file appropriate motions.