CITRONELLE–MOBILE GATHERING, INC., et al., Plaintiffs/Counter-claim-Defendants, Appellees and Cross-Appellants,

v.

John S. HERRINGTON, et al., Defendants, Appellants and Cross-Appellees,

and

United States, Counterclaimant, Appellant and Cross-Appellee.

Nos. 11–7, 11–8.

Temporary Emergency Court of Appeals.

Argued Oct. 17, 1986.

Decided May 7, 1987.

As Corrected June 9, 1987.

Rehearing and Rehearing En Banc Denied June 23, 1987.

Brian G. Kennedy, with whom Richard K. Willard and Surell Brady, Department of Justice—Civil Division, Washington, D.C., and Theodore Miles, Diana D. Clark, Marcia K. Sowles, and Maureen Katz, Dept. of Energy, Washington, D.C., were on the brief for defendants, appellants and cross-appellees.

Keith A. Jones, with whom John M. Simpson, Fulbright and Jaworski, Washington, D.C., and G. Sage Lyons and J.P. Courtney, III, Lyons, Pipes and Cook, Mobile, Ala., were on the consolidated brief for the private parties as plaintiffs/counterclaim-defendants, appellees and cross-appellants.

Charles E. McTiernan, Jr., with whom Donal F. McCarthy and Brian E. Cray, New York City, were on the brief for amicus curiae Consolidated Edison Co. of New York, Inc.

Stephen A. Bokat and Lynn M. Smelkinson, National Chamber Litigation Center, Inc., Washington, D.C., were on the brief for amicus curiae Chamber of Commerce of the U.S.

Before GIGNOUX, GRANT, and PECK, JJ.

GRANT, Judge.

This action was initially filed by Citronelle-Mobile Gathering, Inc., and others (hereinafter referred to as the Chamberlain Group), seeking declaratory and injunctive relief against officials of the Federal Energy Administration, now the Department of Energy (DOE), and the Secretary of the Department of Commerce, to establish plaintiffs' legal rights with respect to four sales of crude oil made between December 1973 and April 1974.

The Government counterclaimed, seeking to compel Bart B. Chamberlain (Chamberlain), Citronelle-Mobile Gathering, Inc. (Gathering), and Citmoco Services, Inc. (Services), to make restitution of alleged overcharges received as a result of the four transfers of crude oil to the Grand Bahamas Petroleum Company, Ltd. (PETCO), a Bahamian corporation, and a wholly-owned subsidiary of an American firm, New England Petroleum Corporation (NEPCO).

The first three shipments of crude oil were sold at a price of $14.00 per barrel, and the fourth and final shipment at $13.00 per barrel, prices admittedly higher than the price the Chamberlain Group could lawfully have charged had the sales been made in the United States to United States purchasers. The Chamberlain Group, however, contended that these shipments were "export sales" excluded from domestic petroleum pricing regulations.

The counterclaimant sought to compel the Chamberlain Group to make restitution of these alleged overcharges by paying into an escrow account, for subsequent disbursement to appropriate persons, a portion of the revenues they received from the sale of the crude oil, represented by the difference between the payments actually received and the maximum lawful selling price allowed by the Economic Stabilization Act of 1970 (ESA), as amended, 12 U.S.C. § 1904 note; the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. §§ 751, et seq.; and the regulations promulgated thereunder which established the ceiling price for the resale of domestic crude oil. See 6 C.F.R. Part 150 and 10 C.F.R. Part 212.

We have jurisdiction under Section 502 of the Department of Energy Organization Act (DOE Act), 42 U.S.C. § 7192; §§ 208, 209 and 211 of the Economic Stabilization Act (ESA), 12 U.S.C. §§ 1904 note and 207, as incorporated in § 5(a) of the Emergency Petroleum Act (EPAA), 15 U.S.C. § 754(a), and Section 208 of the ESA, 12 U.S.C. § 1904 note. Venue is proper in accordance with 28 U.S.C. § 1391(a).

## The Parties

Bart B. Chamberlain is a citizen and resident of the State of Alabama. He is President, a director, and ninety (90) percent stockholder of counterclaimant-defendant Gathering, and President, a director, and eighty-seven and a half (87.5) percent stockholder of counterclaimant-defendant Services. Chamberlain is also the owner of certain crude oil produced from the Citronelle Field located in Mobile County, Alabama.

Gathering is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Alabama. Gathering is engaged in the business of purchasing crude oil produced from the Citronelle Field in Mobile County, Alabama. Gathering is also engaged in the transportation and resale of such crude oil.

Services is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Alabama. Services is engaged in the business of storage of crude oil purchased, transported, and sold by counterclaimant-defendant Gathering. Services also made one transfer of crude oil on or about May 26, 1974.

Counterclaimant is the United States of America, suing on behalf of the DOE, which assumed the powers and functions of the Federal Energy Administration (FEA) on October 1, 1977.

## Background

In December 1973, at the height of the Arab oil embargo, and soon after the enactment of the Emergency Petroleum Allocation Act (EPAA), Chamberlain met with Edward M. Carey, Sr. in New York City. According to the testimony of Chamberlain, they reached an agreement by which Chamberlain would sell Carey three cargoes of oil, initially at $14.00 per barrel. As a result of this agreement, Chamberlain's companies made four shipments of crude oil totaling nearly a million barrels to PETCO, the wholly-owned Bahamian subsidiary of the American corporation NEPCO, which was controlled by Carey. (A fuller factual background is found in the earlier published opinions of *Citronelle-Mobile Gathering, Inc. v. O'Leary*, 499 F.Supp. 871 (S.D.Ala.1980), and *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Temp.Emer.Ct.App.), *cert. denied*, 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982).)

Newly promulgated export license regulations of the Department of Commerce required the Chamberlain Group to establish that the total quantity or quality of petroleum available to the United States would not be diminished. 15 C.F.R. § 377.-6(b)(1). To satisfy that requirement, the Chamberlain Group certified that the Citronelle crude oil "will be processed in the [Bahamian] refinery into various petroleum products, all of which will be purchased by NEPCO and exported from the Bahamas to the United States of America." *Citronelle-Mobile*, 499 F.Supp. at 877. The refinery is partially owned by the Carey companies.

The first three export licenses were granted in routine fashion, but the fourth application, while originally denied, was reviewed by a newly organized Petroleum Products Exceptions Committee, consisting of officials from the Departments of Commerce and State and the Federal Energy Office (FEO), which was then responsible for administering the price controls on crude oil.

The Commerce Department finally concluded that it had no authority to deny the export license, whether or not the $14.00 per barrel price was a violation of DOE's price regulations (that being a matter within the jurisdiction of the DOE) and, accordingly, the fourth export license also issued.

Prompted by publicity concerning these transactions, the Department of Energy set out to make various inquiries and investigations and issued certain administrative subpoenas. The Chamberlain Group initiated litigation seeking to enjoin any such investigations. Thereafter, the United States counterclaimed, demanding restitution of the alleged overcharges, represented by the difference between the price

charged for the oil and the maximum lawful selling price. The Chamberlain Group argued that certain allocation regulations of "export sales" operated to fit their sales within the pricing control exclusion for "exports" under the terms of 10 C.F.R. § 211.-1(b)(1). Specifically, the Chamberlain Group relied on 6 C.F.R. § 150.54(d)(1) ("The prices charged for export sales including the sale of products to a domestic purchaser who certifies that the product is for export are exempt."), and on 10 C.F.R. § 212.53(a), which contains similar language. The district court denied the offered interpretation of the regulations.

### History of this Litigation

In its September 15, 1980 Order granting, in part, summary judgment to the government, the district court held that:

(1) the four transactions violated the applicable price control statutes and regulations, 499 F.Supp. at 883–4;

(2) judgment should be entered in favor of the United States and against Citronelle-Mobile Gathering, Inc., Citmoco Services, Inc., and Bart B. Chamberlain, Jr., for restitution of all excess charges in the four transactions, such restitution to be made to the United States Treasury, 499 F.Supp. at 886; the Court ruled that Bart B. Chamberlain was individually liable as a central figure in the illegal transactions, but only to the extent that he personally received proceeds from the sales, 499 F.Supp. at 881; and

(3) being "unable to determine from the evidence the amount of restitution to be made, [t]he parties will accordingly be permitted the opportunity to enter a stipulation, failing which, to file appropriate motions." 499 F.Supp. at 888.

Thereafter, the court, pursuant to 28 U.S.C. § 1292(b), granted plaintiffs permission to seek an appeal from the above Order of September 15, 1980 (and another Order not relevant here). In certifying an appeal, in an Order dated March 23, 1981, the district court stated:

*The case is postured as having been resolved on the merits with only the amount of damages to be calculated* (emphasis added), a task which may prove as arduous as the case itself. This will require the court to determine the prices and destinations of thousands of barrels of oil.

The plaintiffs, in their motion to reconsider ... have claimed substantial amounts in credits and setoffs for state and federal income taxes paid on the proceeds of these transactions.

\* \* \* \* \* \*

These considerations and calculations, if granted in whole or in part, will be difficult. The dollar amounts involved are substantial. In this regard alone, certification will materially advance the ultimate termination of this case. Order at 1, 2.

On appeal, the Chamberlain Group argued that the transactions were export sales, and that the grant of restitution to the United States Treasury was erroneous. This Court, *Citronelle-Mobile Gathering, Inc. v. Edwards*, 669 F.2d 717 (Temp.Emer. Ct.App.1982) (Pointer, J., concurring in part and dissenting in part), affirmed the district court's holding that the sales of American crude oil by an American firm to the wholly owned subsidiary of another American firm were not "export sales" within the meaning of the EPAA and its regulations, and were, therefore, not exempt from price controls. Such sales were described as involving "a mere hint of foreign participation, were designed so as to take advantage of the established regulations and were completely repugnant to Congress' intent." 669 F.2d at 720–21.

This Court further held that the government was not required to make any showing that damages had been incurred as a result of the violations, 669 F.2d at 722, but that "the government has a *duty* to try to ascertain those overcharged, and refund them, with interest, from the restitution funds." 669 F.2d at 723 (original emphasis). Thereupon, this Court remanded the case to the district court to determine the amount of restitution and to fashion a plan for the appropriate distribution of those funds.

On remand, the district court reduced the restitutionary awards by the amount of state and federal taxes paid thereon and, further, held that Chamberlain's liability should be limited to the amount of the proceeds which he actually received from the overcharges. Both sides brought this appeal. We confront the following issues:

    I. Whether it is now settled as the "law of the case" that the sales of crude oil by plaintiffs to a Bahamian refinery were not exempt from price controls and regulations;

    II. Whether the district court properly determined the extent of Chamberlain's personal responsibility for the overcharges;

    III. Whether the district court erred by subtracting from the restitutionary recovery the amount of taxes paid thereon;

    IV. Whether the district court assessed prejudgment interest at the proper rate;

    V. Whether the district court erred in refusing to allow the Department of Energy to use its Special Refund Procedures (10 C.F.R. part 205, subpart V) to distribute the moneys repaid?

---

## I

*The four shipments of crude oil from the Chamberlain Group to PETCO were not exempt from price controls*

▪ In contesting the earlier finding of liability, the Chamberlain Group poses the wrong question. The issue is not, as they seek to phrase it, whether these sales moved in export, but, rather, whether they were exempt from domestic price controls. The fact that the shipments have gone overseas en route to their ultimate destinations does not preclude further inquiry into whether they were export sales in the context of domestic price controls. As we stated in our earlier opinion:

This transaction, admittedly clever, is not original. In 1883, the Attorney General issued an opinion evolving from circumstances in which whiskey was to be shipped from the United States to Bermuda with the intent that it be returned to the United States after it had been aged. That opinion, holding there was no exportation, was later quoted with approval by the Supreme Court. *See Swan & Finch v. United States*, 190 U.S. 143, 145, 23 S.Ct. 702, 703, 47 L.Ed. 984 (1903), *quoting* 17 Op.A.G. 579, 583 (1883). The Court stated:

[T]he legal notion ... of exportation is a severance of goods from the mass of things belonging to this country with the intention of uniting them to the mass of things belonging to some foreign country.

*Id.* at 145, 23 S.Ct. at 703. *See also United States v. 200 Watches*, 66 F.Supp. 228, 230 (S.D.N.Y.1946). In the case at bar, appellant's intention was that the refined products attributable to the Chamberlain firm's crude oil be returned to the United States. There was never any intention that the crude oil be joined with the mass of things in the Bahamas.

669 F.2d at 719.

▪ The Chamberlain Group, as the lead issue in their brief and as a principal contention on this appeal, seek to reargue the issue of the applicability of price controls and regulations to the four shipments of crude oil. Apparently, they refuse to accept the results of their first appeal.

In securing export permits from the Department of Commerce, the Chamberlain Group contended that the entire process should be viewed as a single transaction. They relied on a round-trip-transaction theory and, in support thereof, represented to the Department that the crude oil was not lost to the domestic market, certifying that "the total quantity or quality of petroleum available to the United States would not be diminished." In an effort to avoid the adverse result of their first appeal, the Chamberlain Group now argues that "new evidence" proves that this crude oil was shipped to the "unclean hands" of PETCO in the Bahamas, where the excessive costs were paid and, arguably, were not passed on to the consumers in the United States.

A review of prior proceedings will affirm that the so-called "new evidence" is not new, and further, has already been effectively answered by this Court.

On an interlocutory appeal limited to the district court's judgment ordering restitution of all excess charges, this Court affirmed. But we also noted that "payment to the United States Treasury is not restitution, in the true sense of the word, or in the objectives of the statutes here involved." 669 F.2d at 722. Finding the prevention of unjust enrichment to be an important objective of the restitution remedy, this Court then modified the district court's Order, directing the government to provide a plan, to be approved by the district court, for the appropriate distribution of the restitutionary award. In affirming the district court's finding that the Chamberlain Group had violated domestic price controls, we wrote: *"No proof is required that the plaintiff (sic) was damaged, much less the amount of any damage."* 669 F.2d at 722 (emphasis supplied).

Upon remand, Judge Alaimo, by Order dated September 30, 1985, stated:

Most of the factual issues in the case were previously disposed of on cross-motions for summary judgment.... *The findings of fact contained herein are made only for the limited purpose of ruling on the amount of restitution to be awarded and are not intended to displace the earlier findings of this Court, which are now the law of the case and are not subject to being relitigated at this late date.* (emphasis supplied).

Order at 4 n. 1.

We find no reason to further belabor an issue that has been so thoroughly briefed, argued and considered in this case. We reaffirm, as the law of the case, our previous holding that the four shipments of crude oil from the Chamberlain Group to PETCO were not exempt from domestic price controls under the provisions of the EPAA and subsequent regulations, and that the Chamberlain Group must make restitution.

## II

### *Chamberlain is personally liable for the entire amount of restitution ordered*

The Chamberlain Group and Amicus Chamber of Commerce insist that basic principles of corporate formation preclude this Court from holding Bart Chamberlain personally responsible for the violations committed in the name of the corporate entity. These basic principles teach that corporate shareholders, officers, and directors enjoy limited liability for corporate wrongdoing.

At the outset, we note that the law recognizes occasional exceptions to the general rules. For instance, a shareholder's refusal to respect corporate formality may invite a court to "pierce the corporate veil" in order to reach the individual wrongdoer. Here, however, the government advances a different theory of personal liability. The government has sought a holding of personal liability against Chamberlain on the ground that Chamberlain is a "central figure" in the misconduct of the corporation insofar as his misconduct has brought about the corporate violations of crude oil pricing laws. Although the traditional rationale for piercing the corporate veil is that the corporation is something less than a bona fide independent entity, here, the government urges us to focus on Chamberlain the actor, rather than Chamberlain the owner. His liability is in no way dependent on a finding that his companies are inadequately capitalized, that his companies are a mere alter ego of Chamberlain, that the corporate form is being used to perpetrate a fraud, or that his companies have failed to comply with corporate formalities. Liability is premised only on a finding that Chamberlain committed the wrongful acts.

The Chamberlain Group concedes the existence of this theory of personal liability, but argues that liability is limited to the extent Chamberlain has committed a common law tort or, in other words, that Chamberlain cannot be held liable for conduct which cannot be packaged as a tort under the common law. The Chamberlain Group

finds particular comfort in this version of the theory, given the trial court's suggestion that Chamberlain and his companies have merely committed an "honest mistake" in running afoul of the export pricing restrictions. The government characterizes such an honest mistake as a gambling, miscalculated effort to stretch the limits of the law—as nothing other than a statutory violation which can give rise to personal liability for Chamberlain in the amount of the overcharges.

The Chamberlain Group argues that this Court's decision in *Johnson Oil Company, Inc. v. U.S. Dep't of Energy*, 690 F.2d 191 (Temp.Emer.Ct.App.1982), disposes of the liability issue presently before the Court. We disagree. *Johnson Oil* also involved pricing overcharges, but its holding relating to personal liability was very limited: The corporate officers had not knowingly, willfully, or maliciously authorized violations of the law and, therefore, could not be held individually responsible under 15 U.S.C. § 754(a)(4). *Johnson Oil* did not present the Court with liability questions premised on theories of individual tortious conduct or piercing the corporate veil. 690 F.2d at 203. In this respect *Johnson Oil* was entirely unlike this Court's decision in *United States v. Arizona Fuels Corporation*, 638 F.2d 239 (Temp.Emer.Ct.App. 1980), *cert. denied*, 451 U.S. 985, 101 S.Ct. 2318, 68 L.Ed.2d 842 (1981), wherein the sole stockholder of Arizona Fuels Corporation was held jointly liable on the basis of a finding that large amounts of corporate funds were diverted for personal use.

This Court's recent decision in *United States v. Sutton*, 795 F.2d 1040 (Temp. Emer.Ct.App.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987), is more relevant. *Sutton* involved miscertification, or "tier laundering," of crude oils—a plan carried out by Sutton under the protective wing of his corporation. Sutton argued, unsuccessfully, that 15 U.S.C. § 754(a)(4) provides the exclusive remedy for knowing and willful violations of the Act by corporate officers (i.e., no personal liability upon the basis of alter ego or tortious conduct). *Sutton* explicitly rejects such a narrow view of personal liability. 795 F.2d at 1059. Rather, this Court in *Sutton* affirmed the trial court's imposition of personal liability on the alternative basis of Sutton's noncompliance with corporate formalities ("piercing" theory) and, also, Sutton's own decisive role in violating the pricing laws ("central figure" theory). As this Court in *Sutton* was careful to stress, personal liability premised upon the latter theory "depends upon the individual's acts." 795 F.2d at 1060.

Inasmuch as Chamberlain is the dominant figure of the Citronelle companies, the government urges this Court to recognize his personal responsibility on the strength of a "central figure" theory of liability. The Chamberlain Group, on the other hand, insists that *Sutton* first requires a finding that Chamberlain has committed a recognizable "tort" before personal liability ensues. We acknowledge the tortious conduct language in *Sutton*. ("A shareholder may be liable if he is the 'central figure' in a corporation's tortious conduct." 795 F.2d at 1060). Essentially, however, the Chamberlain Group argues that a corporate officer cannot be held liable for *unintentional* "tortious conduct." Cross-Appellant Brief at 37. "Tortious conduct," according to the Chamberlain Group, is epitomized by the miscertification-fraud scheme of the *Sutton* case.

█ The Chamberlain Group finds particular comfort in this view of a central figure theory of liability, based upon the trial court's characterization of their conduct as that of "good faith." 499 F.Supp. at 888. They argue that such a finding precludes the existence of culpable conduct and therefore forecloses a judgment of personal liability. But we cannot accept such an expansive view of the trial court's references to good faith.

First, "good faith" has no meaning without a context. It is an intangible and abstract quality; at one time it might indicate an honest belief, the next time it could signify only the absence of malice. Black's Law Dictionary 623 (5th ed. 1979) Second, the trial court used the term good faith in a context that tells us nothing about the

scope of liability the government now urges upon the Court. In considering whether to assess an added penalty on the Chamberlain Group, which would require a finding that they "willfully" violated the FEA pricing regulations, the district court found instead that they "made a good faith effort to comply with the regulations." *Id.* Therefore the added penalty was not imposed. But the court's statement tells us only that the Chamberlain Group did not act "willfully" to violate the regulations. The statement gives no instruction on whether the Chamberlain Group intended their effort to comply with the spirit of the price control laws and regulations, or whether there existed any sound rationale for believing that their ephemeral success in obtaining permits could excuse their obligation to charge the crude oil price prescribed by law. In short, the court's good faith reference did not close the book on equitable considerations, nor did it preclude our examination of Chamberlain's personal role in violating the pricing laws.*

Judges Pittman and Alaimo and the first panel of this Court rested their decision on cases which recognize that personal liability of corporate personnel need not be dependent upon establishing the elements of common law torts.

In *LCL Theatres v. Columbia Pictures Industries*, 619 F.2d 455 (5th Cir.1980), the "tortious act" was the nonperformance of a contractual obligation. The court found personal liability because the corporation's president and principal shareholder authorized, participated in and approved the breach of duty. Similarly, *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602 (3d Cir.1978), held the president of a corporation personally liable for authorizing the acts of unfair competition which formed the basis for the corporation's liability. *Tillman v. Wheaton-Haven Recreation Association, Inc.*, 517 F.2d 1141 (4th Cir.1975), held the directors of a community swimming pool association personally liable under the federal civil rights statutes for causing discrimination against black applicants for membership. The court's holding explored the par-

allel between conduct which violates general principles of tort law, and conduct which infringes rights secured by statutes. The court also explicitly rejected as a defense due diligence based on the advice of counsel. A rather different analysis was used in *United States v. Pollution Abatement Services of Oswego, Inc.*, 763 F.2d 133 (2d Cir.), *cert. denied, Miller v. United States*, 474 U.S. 1037, 106 S.Ct. 605, 88 L.Ed.2d 583 (1985). The Second Circuit affirmed the finding of personal liability for officers of a closely held corporation because the officers' activities—failing to prevent the illegal dumping of dangerous wastes—fell within the "proscriptive ambit" of the applicable statute. Their liability "was not premised solely on their corporate offices or ownership, but was bottomed on their personal involvement in the firm's activities." 763 F.2d at 135.

■ We believe the sum of the holdings in these cases is that personal responsibility for corporate liability may attach when the individual's wrongful conduct causes the violation of a statute and accompanying regulations such as the crude oil pricing laws. But because restitution is an equitable remedy, we would be careful to condition a finding of personal liability on the particular circumstances and equities of each case.

■ Chamberlain played the central role in the Chamberlain Group's breach of public duty as defined by the statute and pricing regulations. Chamberlain authorized and conducted the very negotiations leading to the violations for which the corporations are now liable. Chamberlain knew the agreement was to charge a price almost three times greater than the domestic price ceilings would permit. He knew domestic customers would be the ultimate consumers of the refined oil, but nevertheless used a "loophole" which he believed would excuse him from charging the lawful price. His companies stood to gain some six million dollars in additional revenue. In rejecting the Chamberlain Group's arguments, the district court, Judge Pittman,

---

* The first TECA panel's reference to good faith, 669 F.2d at 722, was made in a similar vein.

remarked that "these transactions had precisely the effect which Congress sought to avoid in enacting the EPAA ... The court must determine whether the transactions were exempted from pricing regulations by the export license. They were not." 499 F.Supp. at 883. We conclude that Chamberlain's conduct constitutes actual participation in the wrongful acts.

■ Chamberlain argues that he relied on the advice of counsel. Even if we were to recognize, as a matter of law, the existence of a due diligence defense, we do not believe Chamberlain has established such a case. We balk at embracing this argument for two reasons. First, it suggests that counsel's view of the law must be the law of the Court, that the Court is not permitted to scrutinize the adequacy of counsel's inquiry. Second, we are not persuaded that Chamberlain's deference to counsel excuses what amounts to acting in disregard of the crude oil pricing restrictions. The due diligence defense would apply if, after diligent effort, it was impossible for Chamberlain to know that his companies were violating the law. At the time, Chamberlain directed successful businesses and was experienced in the world of selling oil. All oil corporations knew about the laws Congress passed to cope with the pain of the oil embargo, and Chamberlain was certainly aware of pricing restrictions and the existence of the Department of Energy and its predecessor, the Federal Energy Administration. Chamberlain's reliance on the "authority" of export permits issued by the Department of Commerce as a justification for his scheme can be characterized as nothing other than acting in disregard of the pricing controls that he knew existed. Whether Chamberlain hoped, with advice, that the transfers of oil would elude the reaches of the domestic price controls, or whether he simply ignored the better judgment that would have advised greater caution, this Court concludes that Chamberlain's disregard of the price control laws caused a breach of the duty delineated in the energy statutes and pricing regulations. Under a central figure theory of liability, Chamberlain may be held personally liable for restitution.

■ The district court, Judge Pittman, held Chamberlain personally liable only to the extent he received proceeds from the illegal sales. Liability was thus limited "[b]ecause restitution is predicated upon a finding of unjust enrichment." 499 F.Supp. at 881. On remand after the first appeal, Judge Alaimo adopted the earlier view of the extent of Chamberlain's liability and fixed the amount of restitution accordingly:

> The parties have stipulated that Chamberlain earned $147,828.59 in excess of the applicable ceiling prices for domestic oil sales. Less the $8,869.71 he paid in state severance taxes, Chamberlain personally netted $138,958.88 from the PETCO sales, and counterclaimant is thus entitled to restitution in that amount.

Order at 12.

The district court declined to "reconsider" whether Chamberlain could be held personally liable for the entire amount awarded against the Chamberlian Group because, in its view, the parties already had the opportunity to appeal personal liability issues to this Court and, therefore, this Court's previous ruling should "remain undisturbed as law of the case." Order at 13.

We reject the district court's finding that the parameters of Chamberlain's personal liability have been established previously as law of the case. The first panel of this Court took the case on interlocutory appeal under 28 U.S.C. § 1292(b). Primarily, the appeal concerned whether the Chamberlain companies had violated the pricing control regulations. As one judge of this Court remarked with respect to restitution issues:

> There [was] no cross-appeal by the government under § 1292(b), and there [was] no final judgment in the district court from which appeals might be taken on all issues which bear upon the proper relief, if any, to be granted on proof of statutory violations.

669 F.2d at 727 (Pointer, J., dissenting). Now, however, the district court has entered a final judgment, this Court has combed through the more comprehensive briefs of the parties, and we can decisively

express in what manner we disagree with the decision below.

■ "Ordinarily, the measure of restitution is the amount of enrichment received." Restatement of Restitution § 1 comment a (1937). However, restitution also can serve "to restore the status quo." *Sauder v. Department of Energy*, 648 F.2d 1341, 1348 (Temp.Emer.Ct.App.1981). "[A] person who has been unjustly deprived of his property or its value ... may be entitled to maintain an action for restitution against another although the other has not in fact been enriched thereby." Restatement of Restitution § 1 comment e (1937).

In *Sutton,* this Court found that "[a] person who is the 'animating force' for regulatory violations is fully liable even though he does not personally receive all benefits of his illegal activities." 795 F.2d at 1063. Consequently, this Court held Sutton personally responsible for the entire amount of restitution awarded for corporate violations.

Our holding in *Sauder* is closer factually to this case and equal to *Sutton* as precedent for holding Chamberlain fully responsible for the amounts awarded as restitution. Sauder was the part owner and operator of three oil leases. He owned a 34% interest in one lease, and a 41% interest in another. He shared ownership of the leases with at least five other persons, and these part owners operated the leases as if they were a single unit. However, they never entered a formal unitization agreement which would combine the separate interests into one tract so that oil could be extracted without regard to surface property lines. This failure to unitize the field proved to be fatal to Sauder's attempt to come within the exemption from price controls for "stripper" well leases. Treated as one lease or "property," Sauder's holdings would have satisfied the language of the exemption for "any lease whose average daily production of crude oil for the preceding calendar year does not exceed 10 barrels per well." 648 F.2d at 1342. Sauder claimed the stripper well exemption because he viewed the leases as one unit. The Department of Energy disagreed, finding that the leases must be considered as three properties and, therefore, outside the exemption.

This Court affirmed the decision ordering Sauder to refund the *full amount* of the overcharges on the nonexempt oil. We rejected the argument that Sauder should be responsible only for the amount of his pro rata interest in the leases. Sauder was the "animating force" who certified that the output of the leases was stripper well oil subject to the exemption. "It can fairly be said that it was he who caused the overcharges." 648 F.2d at 1347.

Similarly, Chamberlain has been the "animating force" behind the sale of Citronelle Field oil to PETCO. Like Sauder, he sought to take advantage of what he considered a "loophole" in a maze of regulations, despite a public policy disfavoring exemptions from domestic oil price controls. Both individuals gambled and lost. Like Sauder, "[i]t can fairly be said that it was [Chamberlain] who caused the overcharges."

In *Sauder,* we rejected the argument that the common law concept of restitution does not permit a court to order an infringer to refund benefits never received by that individual. 648 F.2d at 1348. We refused to characterize the decision to hold Sauder fully responsible in restitution as an attempt to award damages to the victimized party. Rather, we imposed liability in such a manner as to restore the precise amount of the overcharges, "to set things right." 648 F.2d at 1348.

We recognize that the finding of liability is premised upon a "central figure" theory here, and upon an "operator" theory in *Sauder.* But the distinction is without a material difference. "Central figure" theory is the specific language of the corporate-director realm, whereas "operator" theory need not be so specifically applied. The theories accomplish the same thing by holding responsible the primary instruments of illegal conduct. Any doubt that *Sauder* could be applied in the corporate context was resolved by the reliance *Sutton* placed on the *Sauder* decision.

Because a corporate officer's unlawful conduct may form the basis for personal liability if the equities of the case demand it, as they do here, we conclude that the principle of *Sauder* applies to require us to rule that Chamberlain is fully responsible for making restitution to the injured parties.

### III

*The district court erred by subtracting from the restitutionary recovery the amount of taxes the appellees had paid thereon*

Following remand, Judge Alaimo, in an Order dated September 30, 1985, found that "[s]imple arithmetic reveals that defendant's sales to PETCO gave rise to overcharges totaling $6,769,956.76." Order at 6. Notwithstanding that fact, the district court, in an effort to determine "the amount by which defendants were unjustly enriched as a result of the illegal sales," Order at 5, reduced that figure by various overhead and administrative expenses and, finally, by the state and federal income taxes each company had paid on the overcharges. The court found that Chamberlain had earned $147,828.59 in excess of the lawful ceiling price from his share of the crude oil which had been collected for the sale to PETCO, and had paid $8,869.71 in state severance taxes thereon. Thereupon, the court ordered that judgment be entered against Citronelle-Mobile Gathering, Inc. and Citmoco Service, Inc. jointly and severally in the amount of $3,400,-475.76, plus interest, and against Bart B. Chamberlain in the amount of $138,958.88, plus interest. The decision amounted to reducing the restitution by half.

The Chamberlain Group urges this Court to affirm Judge Alaimo's decision to subtract taxes paid from the restitution award. Their position rests largely on resurrected arguments which attempt to deny their own culpability and which emphasize the district court's apparent inability to find injury. According to the Chamberlain Group, restitutionary payments would simply be windfalls to uninjured and undeserving beneficiaries. Because Chamberlain

committed only an "honest error," the Chamberlain Group contends that the district court ruled properly in subtracting taxes in order to prevent "double recovery" by the government.

This line of argument is misdirected, not only because it contests the basis for our finding a violation of the price controls, but because it also posits the scenario of the government "positioning *itself*" for a windfall recovery. Any illusion the Chamberlain Group has of the federal government padding its wallet may have been created by Judge Pittman's initial decision to award restitution in favor of the U.S. Treasury. But we have already corrected that decision and, consequently, fears of government "positioning" should have been eased.

■■■ The district court has broad powers to fashion equitable relief. The equitable remedy of restitution should make victims whole, unless some compelling reason counsels otherwise. We believe the subtraction of taxes precludes the award of an amount which would make victims whole and we find no compelling reason to detour from pursuing that objective. When the district court strays from its duty to order proper restitution, it is our role "to do equity" and correct the lower court. *Citronelle-Mobile*, 669 F.2d at 722, 723 (cited in *United States v. Exxon Corporation*, 773 F.2d 1240, 1284 (Temp.Emer. Ct.App.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986)). We conclude that the district court improperly reduced the restitutionary amount and, therefore, failed "to do equity."

■■■ Upon the basis of a finding of "good faith" on the part of Chamberlain, Judge Pittman had refused to impose civil penalties in addition to ordering restitution. But a finding of good faith that would relieve a wrongdoer from civil penalties is not equivalent to a finding that should not be required to make restitution. In *Exxon*, the appellant argued that the "trial Court, as a court of equity, erred in requiring restitution of the full amount of the overcharges with interest." 773 F.2d at 1284.

We rejected that argument in *Exxon* as we do here. As Justice Holmes stated in a different factual situation:

> It may be assumed that he intended not to break the law but only to get as near to the line as he could, which he had a right to do, but if the conduct described crossed the line, the fact that he desired to keep within it will not help him. It means only that he misconceived the law.

*Horning v. District of Columbia*, 254 U.S. 135, 137, 41 S.Ct. 53, 53, 65 L.Ed. 185 (1920).

■ Moreover, there was no requirement that the government identify the particular persons overcharged. In *Exxon*, an action for restitution against the operator of a unitized oil field, this Court held "there was no need for the district court to attempt the impossible task of attempting to ascertain the damages sustained by individual customers of petroleum products." 773 F.2d at 1286. And as this Court has already said, "[n]o proof is required that the plaintiff was damaged, much less the amount of any damage." *Citronelle-Mobile*, 669 F.2d at 722.

The allegation of the prospect of a double recovery by the government finds no support in the record, since the presumption that the federal government will be the primary beneficiary of restitution is an unsound one. Repeatedly, the government has sought permission to utilize its Subpart V procedure to locate injured victims. In fact, before any part of the restitution award accrues to the account of the U.S. Treasury, the government first must make efforts to identify overcharge victims and, perhaps, to spread the recovery among certain states. In any event, the reduction for taxes imperils a restitution award that should restore the status quo.

■ A variation on Chamberlain's central theme is that a decision which does not allow for subtraction of taxes amounts to levying a "double penalty." The Chamberlain Group argues that if it must disgorge the full amount of the overcharges then it should not have been required to pay taxes on the overcharges received. Since the taxes were paid, however, a sum represent-

ing taxes paid should be taken off the top of the restitution award. This argument concludes that a dollar-for-dollar reduction from the judgment is necessary because the corporate income for future years will be insufficient to fully utilize the tax deduction that could be taken as the entire restitution award is paid. We find the conclusion to be entirely speculative. We are satisfied that the Chamberlain Group can pursue its tax grievances with the IRS.

## IV

### *The district court failed to assess prejudgment interest at the proper rate*

■ The district court entered judgment on the reduced restitutionary amount together with prejudgment interest at the rate of 6% per annum as prescribed by Alabama law. On this appeal, the Chamberlain Group has argued that a lower-than-market rate of interest is justified given the relevant equitable considerations. Once again, we are requested to consider such factors as the advice of counsel, "good faith," the lack of injury, the "windfall" that will flow to the government, and the four-year lapse of time before the government decided the oil transactions were illegal. We have already addressed the relative significance of these considerations as they relate to awarding restitution, and have decided, nonetheless, that full restitution is proper.

The duty to make full and adequate restitution must, of necessity, include the benefits the wrongdoer enjoyed by having the use over the years of the money illegally obtained. Although the district court does have some discretion in assessing prejudgment interest, the court neglected to offer a reason for choosing the 6% rate applicable to state court judgments, rather than the market rate. As the district court in *Exxon* stated:

> The court's equitable powers to order restitution permit the court to deprive the wrongdoer of all enrichment obtained at the victim's expense, *Citronelle-Mobile Gathering, Inc. v. Edwards, supra,*

669 F.2d at 722, and that enrichment necessarily includes the benefits Exxon obtained by having the use over the years of the money illegally obtained. Accordingly, this court shall order that restitution of Exxon's overcharges shall be made with interest from the date of overcharge.

*United States v. Exxon Corporation,* 561 F.Supp. at 816, 858 (D.D.C.1983).

In light of the district court's obligation to order restitution, and its failure to explain why it chose a 6% rate, we cannot say the court has exercised its discretion to fulfill that obligation.

We acknowledge that, although federal law governs the rate of prejudgment interest applicable to this case, state law may be used as a guide for a court exercising its discretion. However, no explanatory comments accompany the district court's selection of Alabama's 6% rate. We defer to our language in *Exxon:* "Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." 773 F.2d at 1278. The district court in *Exxon* adopted an interest rate schedule bearing "a reasonable relation to the value to Exxon of the funds it unlawfully retained." 561 F. Supp. at 858. We approved of the decision then, and now we adopt the interest rate schedule offered by the DOE ** as having "a reasonable relation to the value to [the Chamberlain Group] of the funds it unlawfully retained." Restitution should disgorge unjust enrichment and restore the status quo.

Because the DOE interest rate schedule more realistically reflects the full value of money retained by the Chamberlain Group over these years, we meet the equitable objectives of restitution by requiring · an award of interest at market rates.

### V

*The Court allows use of the special refund procedure established in 10 C.F.R. part 205, subpart V*

■ The government has requested that the restitution funds be placed in a special escrow account for distribution pursuant to the refund procedure set out in 10 C.F.R. part 205, subpart V. The Chamberlain Group argues that the use of the special procedure will allow the government to place itself in the position of becoming the "beneficiary of the restitutionary fund."

The decisions of the district courts and the first TECA panel placed on the government the duty of identifying the injured parties and the extent of their injuries. Each court acknowledged the difficulty of that role, but believed that such a tracing was necessary before the method for distribution could be settled.

The government has responded that the appropriate procedure for identifying those proper recipients of the restitutionary funds is the subpart V proceedings it sought to utilize. Subpart V of the 10 C.F.R. part 205 (10 C.F.R. §§ 205.280–205.-288 (1986)) presents the procedural mechanisms established by the Department of Energy for identification of the injured parties and disbursement of restitution funds. Under these specifications, the Office of Hearings and Appeals (OHA) or its appointed administrator solicits, by publication in the Federal Register, applications from any person entitled to a refund. It then processes the applications and approves the refunds. Payments are made to successful applicants from the escrow fund established for this purpose (after satisfaction of costs and charges approved by the OHA).

The district court's Order of December 30, 1985 expressed concerns about the adequacy of the Subpart V procedures. It specifically referred to criticism made in law review notes. Order at 13. However, we are now satisfied that such concerns have been adequately answered by the "significant progress" the OHA has made in implementing the procedures. *See In re Dept. of Energy Stripper Well Exemption Lit.,* 578 F.Supp. 586, 596 (D.Kan.1983).

The initial step in distribution of restitutionary funds is identification of the injured parties. We believe the Department of En-

** See Appendix.

ergy should be allowed to use its established procedures to make those findings and to offer solutions to possibly complex remedial problems. This was the comprehensive approach taken by Judge Theis of the District Court of Kansas, to whom TECA remanded the "Stripper Well" case for the task of "appropriate dispensation of the escrowed funds." 578 F.Supp. at 589.

Nevertheless, it is the duty of the courts to award restitution equitably. It is the responsibility of the court, not of an administrative body like the Department of Energy, to exercise its equitable powers in the final determination of appropriate restitution to the proper parties. Therefore, jurisdiction over the restitution fund will remain in the district court.

### Conclusion

We conclude that Gathering, Services, and Chamberlain, personally, are jointly and severally liable for the full amount of overcharges, $6,769,956.76, plus prejudgment interest according to the market rates set forth in the Appendix.

This Court now remands the case to the district court to maintain jurisdiction over the distribution of the restitutionary award. The district court shall have the tasks of establishing an escrow fund, of overseeing the government's implementation of its Subpart V procedures, of making the final determination of the use of the restitution funds upon receipt of the government's factual determination and recommendations, and of final dispensation of the escrowed amounts.

### APPENDIX

The DOE schedule for the computation of interest on overcharges is reprinted, in part, in 46 Fed.Reg. 21,412–21,414 (1981), along with a description of how interest should be computed at the average prime rate value published in the Federal Reserve Bulletin for each calendar quarter after October 1, 1979.

| Period | Interest Rate (percent) |
| --- | --- |
| Prior to Oct. 10, 1974 | 7 |
| Oct. 10, 1974 to Sept. 30, 1979 | 9 |
| Oct. 1, 1979 to Dec. 31, 1979 | 11.70 |
| Jan. 1, 1980 to March 31, 1980 | 14.25 |
| April 1, 1980 to June 30, 1980 | 15.39 |
| July 1, 1980 to Sept. 30, 1980 | 18.22 |
| Oct. 1, 1980 to Dec. 31, 1980 | 11.74 |
| Jan. 1, 1981 to March 31, 1981 | 14.03 |
| April 1, 1981 to June 30, 1981 | 19.98 |
| July 1, 1981 to Sept. 30, 1981 | 18.27 |
| Oct. 1, 1981 to Dec. 31, 1981 | 20.31 |
| Jan. 1, 1982 to March 31, 1982 | 18.46 |
| April 1, 1982 to June 30, 1982 | 16.02 |
| July 1, 1982 to Sept. 30, 1982 | 16.50 |
| Oct. 1, 1982 to Dec. 31, 1982 | 15.72 |
| Jan. 1, 1983 to March 31, 1983 | 12.62 |
| April 1, 1983 to June 30, 1983 | 11.21 |
| July 1, 1983 to Sept. 30, 1983 | 10.50 |
| Oct. 1, 1983 to Dec. 31, 1983 | 10.63 |
| Jan. 1, 1984 to March 31, 1984 | 11.00 |
| April 1, 1984 to June 30, 1984 | 11.00 |
| July 1, 1984 to Sept. 30, 1984 | 11.84 |
| Oct. 1, 1984 to Dec. 31, 1984 | 12.87 |
| Jan. 1, 1985 to March 31, 1985 | 12.44 |
| April 1, 1985 to June 30, 1985 | 10.72 |
| July 1, 1985 to Sept. 30, 1985 | 10.44 |
| Oct. 1, 1985 to Dec. 31, 1985 | 9.59 |
| Jan. 1, 1986 to March 31, 1986 | 9.50 |

PECK, Judge, concurring.

I write separately only because ever since my earliest contact with this case I have had a different feeling about Chamberlain's activities than those expressed in the majority opinion. Chamberlain first sought and obtained legal advice from a source which we would be hard pressed to declare incompetent, then followed a procedure "government officials had consistently, if begrudgingly" recognized. *Citronelle-Mobile Gathering, Inc., v. Edwards*, 669 F.2d 717, 724 Temp.Emer.Ct.App.1982) (Pointer, J., concurring and dissenting). The fact that the advice was not egregiously erroneous is attested to by the four years which it took government officials to adopt a contrary position. I am similarly concerned with the majority's reliance on *United States v. Sutton*, 795 F.2d 1040 (Temp.Emer.Ct.App.1986), *cert. denied*, ——

U.S. ——, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987), which involved criminal activity and overwhelming evidence of intentional wrongdoing, and which seems to me to be inappropriate. As a result, I am uncomfortable with an opinion which impugns Chamberlain's ethics and procedures, but otherwise concur.